UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

UNITED STATES                          CRIMINAL ACTION

VERSUS                                 NO: 09-63

LOUIS BOYD, JR.                        SECTION: R(5)

## ORDER AND REASONS

Before the Court is defendant Louis Boyd's motion for a new trial pursuant to Federal Rule of Criminal Procedure 33.[1] Because the Court finds there is not a reasonable probability that the result of the proceedings would have been different if the government had disclosed Evelyn French's cooperation with the Drug Enforcement Administration (DEA) in an unrelated matter, Boyd's motion is DENIED.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

On November 18, 2008, Boyd was arrested as part of an undercover narcotics investigation – code name "Operation Sleigh Ride" – conducted by the St. Charles Parish Sheriff's Office (SCPSO).  Following Boyd's arrest, officers executed a warrant to search a home located at 736 East Easy Street, New Sarpy,

---

[1]   (R.  102.)

Louisiana where Boyd was believed to be living.  During the search, officers found plastic bags containing cocaine base ("crack") in the linen closet of the locked master bedroom, as well as a loaded, .32 caliber revolver pistol.  Officers discovered an additional quantity of crack in the kitchen inside a prescription bottle labeled with Boyd's name.

On March 19, 2010, a federal grand jury returned a superseding indictment charging Boyd with one count of conspiracy to distribute fifty grams or more of cocaine base in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B), all in violation of 18 U.S.C. § 846; four counts of distribution of a quantity of cocaine base in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C); one count of possession with intent to distribute five grams or more of cocaine base in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B); one count of being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2); and one count of possessing a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1).[2]  On April 13, 2010, the government filed a Bill of Information to establish Boyd's March 10, 1994 conviction in Louisiana state court of possession with the intent to distribute

---

[2]     (R. Doc. 50.)

2

cocaine, possession with the intent to distribute marijuana, and three counts of distribution of cocaine, all felonies under Louisiana law.[3]  Before trial, defense counsel requested pre-trial disclosures from the government including, *inter alia*, information on confidential informants who would be testifying at trial.  That request stated:  "It is requested that the government reveal the identity of any and all confidential informants who were percipient witnesses in this case and information regarding any promises made to the CI(s) and the information provided by the CI(s)."[4]  Defense counsel also requested that "the government make specific inquiry of each agent connected to the case for discovery requested above."[5]

**A.   Boyd's Trial**

At trial, officers from the SCPSO testified that they conducted Operation Sleigh Ride between December 2007 and November 2008 in the area of the Cart-N-Carry store and West B Street in Norco, Louisiana.[6]  As part of that investigation,

---

[3]   (R. Doc. 54.)

[4]   (R. Doc. 102 at 3-4.)

[5]   (*Id.* at 4.)

[6]   (R. Doc. 108 at 4-5, 34-35, 56, 107.)

3

Officer Charles Franklin, working undercover, began making
narcotics purchases in Norco from Brandi Johnson and Angela
Lindsay.[7]  Franklin testified that Boyd became a person of
interest when Franklin met him in April 2010 at a location where
Franklin had previously purchased narcotics.[8]  Franklin further
testified that he was able to procure a quantity of cocaine base
from Boyd – through Johnson and Lindsay as intermediaries – on
four separate occasions, including once at 736 East Easy Street.[9]
Franklin's testimony was corroborated by Johnson and Lindsay, who
both testified that Boyd lived at 736 East Easy Street[10] and
confirmed that they purchased crack from Boyd on Franklin's
behalf.[11]  In addition, Johnson testified that she had purchased
drugs from Boyd "[s]ometimes on a daily basis, sometimes three
times a week, sometimes more."[12]  She further testified that she
would sometimes stay overnight at 736 East Easy Street and that
Boyd would sleep in his bedroom, which he always kept locked when

---

[7]     (*Id.* at 57-58.)

[8]     (*Id.* at 60.)

[9]     (*Id.* 60-74.)

[10]    (*Id.* at 97, 116; R. Doc. 109 at 7.)

[11]    (R. Doc. 108 at 99-101,122-25; R. Doc. 109 at 5-9.)

[12]    (*Id.* at 114.)

4

he was not in the house.[13]

The government also called Tracy Marie Galiano, who testified that she dated Boyd and lived with him for four months in 2007 at 736 East Easy Street and that, while she was there, Boyd gave her drugs "every single day."[14]  Galiano explained that, although she had keys to 736 East Easy Street "once or twice," Boyd typically kept them.[15]  Galiano also explained that, two weeks after she left 736 East Easy Street in November 2007, she was arrested and put in jail for 13 months.  Galiano stated that, during that time, she called Boyd every day, either on the house phone at 736 East Easy Street or on Boyd's cell phone.[16]

Regarding Boyd's November 18, 2008 arrest and the search of 736 East Easy Street, Richard Dubbs, a detective with the SCPSO who had conducted surveillance of the home, testified that he saw Boyd leave 736 East Easy Street in a green Ford Ranger at approximately 10:25 a.m.[17]  He explained that Boyd was then pulled over for a traffic stop and that officers from the "entry

---

[13]  (*Id.* at 118-19.)

[14]  (R. Doc. 109 at 29, 32-33, 35-36.)

[15]  (*Id.* at 36.)

[16]  (*Id.* at 36-37

[17]  (R. Doc. 109 at 19.)

5

team," of which Dubbs was a part, drove to 736 East Easy Street
to execute a search warrant for the residence.[18]  Dubbs
testified, that, once the team had gained entry into the
residence, he proceeded upstairs, where he forced open a locked
bedroom and found Evelyn French.  According to Dubbs, French had
in her possession a crack pipe; a silver spoon that appeared to
be used to cook illegal narcotics; and a black, 35-millimeter
camera case.[19]

Dubbs further testified that the officers had to force the
door open to gain access to the second bedroom, which Dubbs
described as the master bedroom.[20]  Dubbs explained that, in that
bedroom, he observed a razor blade, white residue, and a black
scale sitting on top of a CD player on the dresser.[21]  Dubbs also
stated that he observed Lewis Boyd's expired driver's license,
which listed his address as 736 East Easy Street, and men's
clothing in the room.  According to Dubbs, he then proceeded
through the master bedroom to the adjoining bathroom, where he
found a clear plastic bag with "large pieces of crack cocaine

---

[18]    (*Id.* at 20.)

[19]    (*Id.* at 21.)

[20]    (*Id.* at 23-24.)

[21]    (*Id.* at 24.)

6

inside" and a .32 caliber revolver in the linen closet.[22]

Another SCPSO detective involved the search, David Ehrmann, testified that he searched the kitchen, where he found a white prescription drug bottle bearing Boyd's name containing an additional quantity of crack and .32-caliber rounds of ammunition.[23] Ehrmann also testified that the house phone at 736 Easy Street rang several times while he was at the residence.[24] According to Ehrmann, he recognized one of the phone numbers on the Caller ID system as belonging to a drug user, Amy Woods, whom the officers were investigating. Ehrmann explained that he picked up the phone and impersonated Boyd. Woods told him she "was looking to purchase $20 worth of crack cocaine."[25] Ehrmann further testified that, some time later, Woods arrived at 736 East Easy Street with $20 in cash and admitted to the Detective Dubbs that she was there to purchase crack.[26]

Most relevant to the instant matter, the government also called Evelyn French. French acknowledged that she had been

----

[22] (*Id.* at 25-26, 28.)

[23] (*Id.* at

[24] (*Id.* at 48.)

[25] (*Id.* at 50.)

[26] (*Id.* at 50.)

given immunity for providing truthful testimony[27] and that she was "in drug court, actively since April 30, 2009" for a possession charge.[28]  French testified that she met Boyd in 2005, at which point Boyd began to supply her on occasion with crack for her personal use.[29]  French stated the she and Boyd later discovered that they were cousins,[30] and that she began living with Boyd at 736 East Easy Street sometime around September 2008.[31]  French testified that she slept in the upstairs bedroom adjacent to Boyd's, that Boyd kept his bedroom locked when he was away from the home, and that she did not have a key.[32]  French also testified that Boyd sold crack out of the house "24/7."[33]

Regarding the November 18, 2008 search, French testified that the officers entered the residence and broke the door to the bedroom where she was asleep.  French explained that the officers found a crack pipe and "two spoons . . . used to recook drugs" in that bedroom and proceeded to issue her a misdemeanor summons and

[27]   (R. Doc. 109 at 42-43.)

[28]   (*Id.* at 41.)

[29]   (*Id.* at 44-45.)

[30]   (*Id.* at 50-51.)

[31]   (*Id.* at 53-54.)

[32]   *Id.* at 54-55.)

[33]   (*Id.* at 56-57.)

question her about Boyd's activities in the residence.[34]  French stated that she told the officers she lived at the residence and that Boyd had drugs in the kitchen, but she "did not tell them everything that [she] knew because [she] was still in [her] addicted behavior . . . and was not willing to give up that information."[35]

French also testified that the officers gave her Boyd's keys after he was arrested "[b]ecause Mr. Boyd allowed her to stay in the home."[36]  She explained that she left 736 East Easy Street after the police conducted the search but returned "after a little while" and found Boyd's niece there.[37]  French said that Boyd's niece wanted a key to a locked bedroom that Boyd maintained at his mother's house, located at 1704 Virginian Colony Avenue, LaPlace, Louisiana.  French explained that she had a key to that bedroom but would not release it to Boyd's niece, so the two proceeded together to the 1704 Virginian Colony residence.  French further explained that, while at 1704 Virginian Colony, she, Boyd's niece, and several other family

---

[34]     (*Id.* at 64.)

[35]     (*Id.* at 70.)

[36]     (*Id.* at 99.)

[37]     (*Id.* at 71.)

members searched the room and found a quantity of drugs.  French stated that she called Boyd's nephew, Arthur Robertson, who asked French to bring him the drugs so that he could sell them to raise money for Boyd's bond, but that Boyd's sister gained possession of the drugs at some point and flushed them down the toilet.[38]

During French's testimony, the government played three recorded conversations that took place between her and Boyd on July 2, 2009 and July 3, 2009 while Boyd was detained at the Nelson Coleman Correctional Center.  The conversations were initiated by Boyd and were preceded by a recorded message explaining that the calls were subject to recording.[39]  In the first conversation, French and Boyd engaged in the following exchange:

French:     When you go to court again?

Boyd:       Uh, I don't know.  I'm trying to get another court date.  Uh, they – they got me.  They done put me back about 3 or 4 times girl.

French:     Uh, huh.

Boyd:       What happening, you know, they don't really have nothing straight, you know.  And they keep pushing me back, you know.  And uh girl don't let them people pick you up cause they – they gonna definitely try to get you to uh, you know, take the stand on me, you know.

---

[38]     (*Id.* at 72.)

[39]     (Gov't Exs. 14(a), 14(b), 14(c).)

```
French:    Well, that's why I have my lawyer.  And I go back
           to court today.  I have my - my uh, drug court
           lawyer.

Boyd:      Ah, huh.

French:    To get in touch with them.

Boyd:      Yeah.

French:    And find out whether or not I have an attachment.

Boyd:      Yeah.

French:    If I do. Try to get that taken care of because it
           ain't for nothing but paraphernalia.  You know
           what I'm saying?

Boyd:      Right but they'll they'll what they'll try to do
           is say well look it was paraphernalia.  But the
           maximum sentence on that is - is 6 months.  But
           then they'll come and say oh well we'll charge you
           with possession of cocaine.  And you know, we'll
           send it to the lab and the lab will come back and
           da da da.  You know I been doing my homework on my
           cases and all that, you know.[40]
```

Later, in the same conversation, French and Boyd discussed

French's interaction with the SCPSO officers on November 18,

2008:

```
French:    And like I told you I didn't tell them nothing.
           But they was like we you live here you gotta.  I
           said I don't' know nothing because I use drugs.
           My cousin don't ain't gonna tell me no business.
           If he suppose to be doing what y'all say he's
           doing he ain't gonna tell me nothing.  Shit!  I
           don't be in his business.  I got my own business,
           he got his own business.  And I ain't been here
```

---

[40]     (Gov't Ex. 14(a) at 3-4.)

11

<div style="margin-left: 2em;">

with this man.  Cause they talking about we been watching him for 11 months.  I said I haven't been here for 11 months.

Boyd:    (Subject laughing.)

French:  So I'm suppose to know whatever going on.  I said that man he a grown man like I'm a grown woman.  He don't be in my business and I don't be in his.

Boyd:    Yeah.

French:  Where y'all find me at?  Locked in my mother fuckin room.  So how could I know what Lou do.  I was sleeping.

Boyd:    This – this – this I think uh they – they say the night before that they had sent somebody.  I think it was Anita.[41]

</div>

In the second conversation, French and Boyd discussed the state of 736 East Easy Street after the search:

<div style="margin-left: 2em;">

Boyd:    Don't be worrying 'bout this, that and the other, you know.  But I'm goinna be home pretty soon, you know.

French:  Well I'm a help you come clean it up.  Cause that's – that's terrible.  That's terrible the way they left that house, bro.

Boyd:    Ah, huh, I know.

French:  Cause when I got back to the house, like I told you, I haul ass and went running for Cookie.  And when I got back your – your niece was in there and them people was gone.

Boyd:    An, huh.  Yeah, they took all my computers, my generators, tools and they put em in the paper

</div>

---

[41]   (*Id.* at 8.)

too.  Saying it was stuff stolen from Gustav.  And if you can – if you want any of your stuff come and claim it.  Ain't nobody claim nuttin yet.  Cause if they would have they'd have come over here and put a theft charge on me for receiving stolen goods.

The government also introduced two letters Boyd wrote to French from jail.  In the first letter, dated June 18, 2009, Boyd referred to "Tracy" and wrote:

The thing that hurt is the fact, all I did for her while she was in here . . . . I took her from a $10 crack whore to a $1000 – $1500 crack whore.  I also was with her when she brought the game to a higher level.  I put her on game.  For her to go back to where I had her at, let me know just how sad those poor white trash crack whore are.  Only thing for me I grew too much feelings for her.[42]

French testified that she understood Boyd to be referring to Tracy Marie Galiano and that the phrase "I took her from a $10 crack whore to a $1,000 – $1500 crack whore" meant Galiano was "tricking in the streets for crack until [Boyd] met her, and he more or less took care of her, supplied her habit, and taught her how to make more money."[43]  With regard to the second letter, dated March 8, 2010, the government had French read the following passage:

Boyd: I've been trying to call you every day, but you do *not*

---

[42]   (Gov't Ex. 19 at 1-2.)

[43]   (R. Doc. 109 at 88.)

accept my call.  What's going on?  Well one thing is for sure and two things are for certain[:] those people got in touch with Amy to testify against me.  She told them that she would plead the *5th* they told her that she could *not* plead the 5th[,] she would have to come and testify against me.  My question to you is this, have they contact you?  Have they spooked you.  Well if they have would you please let me know if that happens.  They will threaten you with a charge of obstruction of justice.  All it is is a threat.  If you are subpoenaed you have to show up for Court, do that and if you feel like you have to get on the stand you get on it and lie like a dog if you have to.[44]

On cross-examination, the defense highlighted that, although French was the only person at 736 East Easy Street when the drugs were discovered, she received only a misdemeanor summons for possession of drug paraphernalia.  The defense elicited that French had been arrested on a number of occasions for issuing worthless checks, theft over $500, and falsification of public records.[45]  French also acknowledged that she had received immunity from federal prosecution even though she had been found at 736 East Easy Street where the police discovered a large amount of crack on the premises.[46]  Based on French's testimony, the defense suggested that French had "a history of being

---

[44]   (Gov't Ex. 18.)

[45]   (R. Doc. 109 at 101.)

[46]   (*Id.* at 91-96.)

14

arrested, with very few convictions."[47]  The defense also
suggested that, contrary to French's testimony, it was she, and
not Boyd, who was selling drugs out of 736 East Easy Street.
Defense counsel questioned her about a statement she made in the
first recorded conversation that she had become involved with a
man named "Martin" and had "got major, major work."[48]  The
defense implied that the term "work" referred to her selling
drugs.[49]  French testified that she was referring to the amount
of drugs that Martin had and that "work" meant she "had a lot of
dope to smoke."[50]  French also denied selling drugs from 736 East
Easy Street.

    The jury also heard testimony from Sergeant Marlon Shuff,
the coordinator of the investigation, who, like Dubbs, testified
that he observed a digital scale, small particles of cocaine
base, and a razor blade with a white powder residue in plain view
in the master bedroom of the home.[51]  According to Shuff, after
seeing those items, he spoke with Boyd, to whom the agents had

---

[47]    (*Id.* at 96.)

[48]    (Gov't Ex. 14(a) at 9.)

[49]    (R. Doc. 109 at 97.)

[50]    (*Id.* at 97-98.)

[51]    (R. Doc. 109 at 107.)

read his *Miranda* rights.[52]   Boyd admitted that the master bedroom was his but denied that he had additional drugs in the residence.[53]   Shuff further testified that, initially, Boyd was "kind of laughing about the whole thing" but that once the officers had uncovered the larger quantities of crack in the master bathroom, Shuff recalled "the blood draining from [Boyd's] face."  Shuff explained: "He basically turned white.  That was pretty much it.  He didn't talk too much after that."[54]

On cross-examination, the defense highlighted that Shuff made the decision not to collect DNA or fingerprints on the evidence found at 736 East Easy Street, even though French was found in the house with drug paraphernalia.[55]   The defense also suggested that Shuff slanted his January 7, 2009 incident report to connect Boyd to 736 East Easy Street.  In the report, Shuff indicated that a search for the license plate of Boyd's vehicle in the National Crime Information Center (NCIC) database returned 736 East Easy Street as the address associated with the vehicle's owner.  Shuff also reported that a cellular telephone used by

---

[52]    (*Id.* at 110-11.)

[53]    (*Id.* at 111.)

[54]    (*Id.* at 112.)

[55]    (*Id.* at 114-15.)

Boyd was registered to Boyd's mother, Rosemary Brown, and that Brown resided at 736 East Easy Street.  The defense introduced printouts from the NCIC database on Boyd's current and expired drivers licenses, both of which listed Boyd's address as 1704 Virginian Colony, LaPlace, Louisiana.[56]  In response, Shuff testified that the NCIC search he conducted listed both 736 East Easy Street and 1704 Virginian Colony.  The defense also introduced a notification of insurance for Boyd's vehicle from the Louisiana Department of Motor vehicles and an AT&T phone bill for the cellular telephone number listed in the report, both of which indicated 1704 Virginian Colony as the address.

George Breedy, a SCPSO lieutenant assigned to the DEA, was also involved in the investigation.  He testified that he had been involved in a separate, similar investigation of Boyd in 1993 that resulted in Boyd's conviction for "three distributions, possessions with intent to distribute marijuana, and the possession with intent to distribute cocaine."[57]  With regard to the events on November 18, 2008, the defense questioned Breedy as to why Evelyn French was not arrested, even though she was found at 736 East Easy Street, suggesting that Breedy was intent on

---

[56]   (*Id.* at 117-18; Defense Exs. D-5, D-6.)

[57]   (*Id.* at 124-31.)

apprehending Boyd because of a grudge he carried from 1993 and thus failed to investigate French.[58]  Breedy explained, "all indications that we had at the time and up until this point is that Ms. French was simply a user," and "[t]his case was about what we believed to be a major drug dealer."[59]  According to Breedy, that French had the crack pipe in her possession was "consistent with a user, not a dealer."[60]  He also testified that Boyd was arrested with the key to the locked master bedroom[61] and that, based on his experience, French exhibited the symptoms of a user.  According to Breedy, if French had access to a large quantity of drugs, "[s]he would have smoked that up, given the opportunity."[62]  Breedy explained that, under the circumstances, it was not unusual that French was issued a misdemeanor summons and permitted to leave.[63]  The defense also questioned Breedy as to whether French returned to 736 East Easy Street to sell drugs after the search.[64]  Breedy explained that he had no information

---

[58]    (*Id.* at 135-42.)

[59]    (*Id.* at 136.)

[60]    (*Id.*)

[61]    (*Id.* at 146-47.)

[62]    (*Id.* at 147.)

[63]    (*Id.* at 137.)

[64]    (*Id.* at 141.)

18

regarding French's activities following her release, but that he "didn't blame her for returning back to the house" because Boyd asked the officers to turn his property over to her, "which included his wallet, which included his keys, his keys to the house, his keys to his room."[65]

   Three of Boyd's family members testified at trial for the defense: (1) Ethel Jones, Boyd's sister;[66] (2) Arthur Robertson, Boyd's nephew;[67] and (3) Ernest Marcelle, Boyd's uncle.[68]  Jones testified that, at the time of Boyd's arrest, Boyd lived with their mother, Rosemary Brown, at the 1704 Virginian Colony residence.  She further testified that, had Boyd moved to 736 East Easy Street in 2008, she "would have known because my mama wouldn't have no way to get to the doctor, and she wouldn't have no way for someone to take care of her."[69]  On cross-examination by the government, Jones acknowledged that she worked 12-hour shifts and did not see Boyd on a regular basis.[70]  Jones also

---

[65]   (*Id.* at 141-42.)

[66]   (*Id.* at 150.)

[67]   (*Id.* at 159.)

[68]   (*Id.* at 164.)

[69]   (*Id.* at 154.)

[70]   (*Id.* at 154-56.)

acknowledged that she knew Boyd was repairing the roof at 736 East Easy Street and that "some nights, he probably stayed there overnight."[71]  Marcelle testified similarly, explaining that Boyd lived with his mother at 1704 Virginian Colony and that, had Boyd moved out, he thought he would have known about it because he visited Brown often and "each time [he] went to her house, [Boyd] was there."[72]

For his part, Robertson also testified that Boyd lived at 1704 Virginian Colony and that Boyd did not sell drugs, but instead "provided a place where women did drugs."  Robertson further testified that, on the evening of November 18, 2008, he went to 736 East Easy Street and found French there.  Robertson explained that he acquired the keys to 736 East Easy Street, including the keys to inside doors, from French and that, "from what [he] got to see, she was getting high and selling drugs, that kind of thing."[73]  Robertson also testified that he saw French selling drugs out of the residence.

Finally, the government called SCPSO Deputy Daniel Bergeron

---

[71]     (*Id.* at 152, 156.)

[72]     (*Id.* at 165.)

[73]     (*Id.* at 161.)

to rebut the testimony of Jones, Marcelle, and Robertson.[74]
Bergeron testified regarding a report that Bergeron prepared
after 736 East Easy Street was burglarized on September 2, 2008.
According to Bergeron, the report listed Boyd as both the
"reporting person" and the "victim."[75]  Bergeron also stated that
the report showed that Boyd reported that two generators, a pair
of shoes, and a watch were taken and that entry was made through
the master bedroom on the second floor.[76]

     Boyd's trial concluded on July 21, 2010, and the jury
returned a guilty verdict on all eight counts of the superseding
indictment the same day.


**B.   Boyd's New Trial Motion**

     Boyd now moves for a new trial pursuant to Federal Rule of
Criminal Procedure 33 based on the government's post-trial
disclosure that French became a confidential informant for the
DEA on June 2, 2010 and made a controlled purchase of crack in
another investigation June 9, 2010, approximately six weeks

---

[74]     (*Id.* at 168.)

[75]     (*Id.* at 170-71.)

[76]     (*Id.*)

before Boyd's trial.[77]  The government maintains that, the
Assistant United States Attorney (AUSA) prosecuting Boyd's case,
Andre Jones, learned of French's status as a confidential
informant on August 27, 2010 and informed defense counsel on
August 30, 2010.

The government submitted two affidavits, under seal, to
explain the nature of French's cooperation with the DEA and the
failure to disclose that information to defense counsel before
trial.  In the first of those affidavits, DEA Agent Chad Scott
explained that he was the case agent in the other case in which
the defendant, Wallace Bourgeois, was convicted on drug
conspiracy charges and sentenced to 240 months imprisonment.
Scott said that Bourgeois contacted him in hopes of reducing his
sentence and informed him that his cousin, French, was willing to
make a controlled purchases on his behalf.[78]  Scott explained
that French contacted him in May 2010 and that she made a
controlled purchase of cocaine base and cocaine hydrochloride in
June 2010.  Scott also stated that French did not receive "any
compensation for her assistance nor did anyone from the Drug
Enforcement Administration make any promises to [her]."  Scott

---

[77]    (R. Doc. 102.)

[78]    (Gov't Ex. A.)

described his discovery of French's involvement in Boyd's case as follows:

> After Ms. French made the controlled purchase and after the
> trial in the matter of United States v. Louis Boyd (Docket
> No. 09-063 "R") . . . Ms. French informed me that she
> testified in the Boyd trial.  Although Ms. French had
> previously informed me that she had spoken to Assistant
> United States Attorney Andre' Jones, the prosecutor in the
> Boyd case, she did not tell me that she was testifying in a
> trial.  Accordingly, I did not advise Mr. Jones that Ms.
> French worked as an informant until I presented [another
> case] to him for prosecution on Friday, August 27, 2010.

In the second affidavit, Detective Breedy stated that,
during a meeting with AUSA Jones and "numerous other witnesses"
before Boyd's trial, he engaged in a "casual conversation" with
French in which French informed him that she was assisting Scott
"to assist her cousin."  Breedy said French did not reveal any
other information, and he did not question her further about the
nature of her assistance to the government.  According to Breedy,
AUSA Jones was not in the room during his conversation with
French, and Breedy did not tell Jones about the conversation.
Breedy further explained that, days later, he encountered Scott
and mentioned to him "that I learned he was working with a
witness in one of my cases."  Breedy stated that Scott
acknowledged that he was working with French but "[n]either Agent
Scott nor I discussed the details of the case."  Breedy also
stated that he did not inform AUSA Jones of the conversation with
Scott, explaining:  "Because her work with Agent Scott had
nothing to do with the matter of United States v. Louis Boyd, I

did not believe it was necessary to advise Mr. Jones that Ms. French was assisting the Drug Enforcement Administration on an unrelated matter."

On February 16, 2010, the Court held an evidentiary hearing in order to determine how and why the information about French's involvement with the DEA as a confidential informant was not disclosed to the defense and to determine whether the nondisclosure of this information warranted a new trial. Breedy testified consistently with his affidavit. He testified that he did not know who French was until the November 18, 2008 search, when she was discovered at 736 East Easy Street. According to Breedy, French was arrested by summons and charged in state court for possession of a crack pipe and drug paraphernalia based on the physical evidence and her statement to the officers involved in the investigation. Breedy further testified that French later pleaded guilty in state court before Boyd's trial. Breedy stated that French at no point worked for him as a confidential informant and that he was not aware that she was acting as one in the other case until approximately one to two months before Boyd's trial. According to Breedy, he could not recall AUSA Jones ever asking him for *Brady*/*Giglio* information as to the witnesses who were going to testify in the Boyd case. Breedy knew French would be a witness in Boyd's case, but he claimed

25

that he did not know that French's work for the government in the other case could be *Giglio* material.

The Court also heard from Agent Scott, who stated that French's cooperation in Bourgeois's case was limited to the purchase of 2.5 ounces of crack in one controlled buy. Scott testified that he first met French about two weeks before French made the controlled buy and that she was signed up as a confidential informant about one week later. Scott also testified that he was initially unaware of French's cooperation in Boyd's case but that he learned "some time later" that French had been interviewed by Breedy. According to Scott, he did not know the details of her cooperation in Boyd's case and he never contacted Breedy regarding the matter. Scott stated that French's involvement with him was for consideration in Bourgeois's case only and that French never received any benefit from her cooperation.

In addition, AUSA Jones testified that, after he received the defense's *Giglio* request, he turned over all *Giglio* information that he had at the time and asked the agents involved in the investigation whether they had anything of note to provide the defense. Jones stated that he recalled asking Breedy whether French was a confidential informant in this case, although, as noted, Breedy did not recall that inquiry. Jones maintained that

26

he was unaware of French's role as an informant in the other matter until August 27, 2010.


## II.   DISCUSSION

### A.   Rule 33

Rule 33(a) of the Federal Rules of Criminal Procedure states that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires . . . ."  Notwithstanding this provision, however, "Rule 33 motions based on newly discovered evidence 'are disfavored by the courts and therefore are viewed with great caution.'"  *United States v. Lopez-Escobar*, 920 F.2d 1241, 1246 (5th Cir. 1991) (quoting *United States v. Fowler*, 735 F.2d 823, 830 (5th Cir. 1984)); *see also United States v. O'Keefe*, 128 F.3d 885, 898 (5th Cir. 1997) ("Although grant or denial of the motion is entrusted to the sound discretion of the judge, motions for new trial are not favored, and are granted only with great caution.") (citing *United States v. Hamilton*, 559 F.2d 1370, 1373 (5th Cir. 1977)). The Fifth Circuit has explained that a "court should not grant a motion for new trial unless there would be a miscarriage of justice or the weight of the evidence preponderates against the verdict." *United States v. Wall*, 389 F.3d 457, 466 (5th Cir. 2004).  "A new trial is granted only upon demonstration of

27

adverse affects on substantial rights of a defendant."  *Id.*

**B.    *Brady* Claim**

In *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87.  The Court has since abandoned any requirement that a defendant request the disclosure of favorable evidence, and the *Brady* standard now applies regardless of whether the defendant specifically requests the information.  *Kyles v. Whitley*, 514 U.S. 419, 433 (1995) (citing *United States v. Bagley*, 473 U.S. 667, 682 (1985)).  To establish that the prosecution's failure to disclose evidence violates *Brady*, a defendant must demonstrate: "(1) the prosecution did not disclose evidence; (2) the evidence was favorable to the defense; and (3) the evidence is material." *Bagley*, 473 U.S. at 674.

1.   <u>Failure to Disclose</u>

It is undisputed that the government did not disclose French's cooperation with the government until after the trial, even though the defense specifically requested impeachment

28

evidence.  The government contends that the AUSA Jones learned of French's status as a confidential informant on August 27, 2010, over five weeks after Boyd's trial concluded.  It explains that, although Agent Scott was aware of French's involvement in Boyd's case, and Lieutenant Breedy was aware of French's involvement in both cases, neither agent informed Jones of French's cooperation with the government until after Boyd's trial.  The Supreme Court has been clear, however, that "the individual prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf," including law enforcement.  *Kyles*, 514 U.S. at 437-38; *see also Giglio v. United States,* 405 U.S. 150, 154 (1972) ("Whether the nondisclosure was a result of negligence or design, it is the responsibility of the prosecutor."); *Morrow v. Dretke*, 367 F.3d 309, 316 (5th Cir. 2004) ("In defining the scope of the duty of disclosure, it is no answer that a prosecutor did not have possession of the evidence or that he was unaware of it.").  In short, it is no excuse that Jones was unaware of French's cooperation with the DEA; the law is clear that he had a duty to independently seek out information favorable to Boyd's case.

2.   <u>Favorable to the Accused</u>

Evidence "favorable to an accused" for the purposes of the

29

second prong of *Brady* is not limited to evidence that is
exculpatory.  Because defense counsel could have used French's
cooperation with the DEA as impeachment evidence to demonstrate
bias, it was favorable to Boyd and thus falls within the scope of
*Brady*'s disclosure requirement.  *Bagley*, 473 U.S. at 676-77
("Impeachment evidence, as well as exculpatory evidence, falls
within the *Brady* rule.").


    3.  <u>Materiality</u>

    Evidence is material under *Brady* if there is a "reasonable
probability that the outcome of the trial would have been
different" had such evidence been revealed to the defense.
*Kyles*, 514 U.S. at 433-34. "The question is not whether the
defendant would more likely than not have received a different
verdict with the evidence, but whether in its absence he received
a fair trial, understood as a trial resulting in a verdict worthy
of confidence."  *Id.* (quoting *United States v. Brown*, 303 F.3d
582, 593 (5th Cir. 2002)).

    Boyd argues that evidence of French's cooperation with the
DEA was material because it could have been used (1) for the
purposes of impeachment and (2) to present an entrapment defense.
The Court addresses these two arguments in turn.

a.   *Impeachment*

Nondisclosure of evidence affecting credibility falls with the general rule that suppression of material evidence justifies a new trial irrespective of the good faith or bad faith of the prosecution. *Giglio*, 405 U.S. at 153-54.  When the government has entered into an agreement or understanding with a key witness, the credibility of the witness is at issue and failure to disclose details of the deal may deny the accused due process. *Id.* at 154-55.  Yet, "when the testimony of a witness who might have been impeached is strongly corroborated by additional evidence supporting a guilty verdict, the undisclosed evidence is generally not found to be material." *Spence v. Johnson*, 80 F.3d 989, 995 (5th Cir. 1996) (quoting *Wilson v. Whitley*, 28 F.3d 433, 439 (5th Cir.), *cert. denied*, 513 U.S. 1091 (1994)).  Similarly, when the undisclosed evidence is merely cumulative of other evidence, no *Brady* violation occurs.  *Id.*

Boyd argues that, had his defense counsel known before trial that French was a DEA informant, "he could obviously have cross-examined more effectively concerning her interest in currying favor with the government by means of her testimony."[79]  The Court acknowledges that there is some merit to Boyd's argument.

---

[79]    (R. Doc. 102 at 5.)

According to Agent Scott, French volunteered to make a controlled purchase on the government's behalf in order to curry favor for Bourgeois, who had been convicted on drug conspiracy charges. Had defense counsel been in possession of this information, he could have suggested that French had an incentive to slant or fabricate her testimony to further assist Bourgeois.  The bulk of French's testimony, however, was corroborated by other witnesses. For example, although Boyd contends that French's testimony was critical to the government's case because it supported the government's position that Boyd lived at 736 East Easy Street,[80] Lindsay, Johnson, and Galiano also testified that Boyd lived there and that Boyd was engaged in the distribution of crack.[81] Further, Franklin testified that, while working undercover, he went with Johnson on June 11, 2008 to 736 East Easy Street where Johnson purchased a quantity of crack from Boyd on his behalf.[82] Dubbs testified that he found Boyd's expired driver's license in the master bedroom of the residence, along with men's clothing. And, Shuff testified that, after Boyd was arrested but before the larger quantities of crack were discovered, Boyd admitted that

---

[80]    (R. Doc. 102 at 1-2.)

[81]    (R. Doc. 108 at 97-98, 118-19; R. Doc. 109 at 36.)

[82]    (R. Doc. 108 at 66-68.)

the master bedroom at 736 East Easy Street was his.

To the degree Boyd argues that the undisclosed evidence could have been used to suggest that the drugs found at 736 East Easy Street were French's, Boyd's own statements belie that theory.  In the first recorded conversation played for the jury, Boyd and French discussed the SCPSO's search of 736 East Easy Street, Boyd's arrest, and French's interaction with the officers.[83]   French stated:

> And like I told you I didn't tell them nothing. . . . I said I don't know nothing because I use drugs.  My cousin don't ain't gonna tell me no business.  If he suppose to be doing what y'all say he's doing he ain't gonna tell me nothing. Shit!  I don't be in his business.  I got my own business, be got his own business. . . .[84]
>
> . . . .
>
> Where y'all find me at? Locked in my mother fucking room. So how could I know what Lou do.  I was sleeping.

If, as the defense argued at trial, the drugs at 736 East Easy Street were not Boyd's but instead belonged to French, one would have expected Boyd to have pointed that out to French in the conversation.  Boyd's response, however, was to laugh.  At no point in the conversation did Boyd mention that the drugs belonged to French, not him.

---

[83]    (Gov't Ex. 14(a).)

[84]    (*Id.* at 8.)

33

Similarly, Boyd's March 8, 2010 letter to French is inconsistent with his claim that the drugs belonged to French. In that letter, Boyd wrote: "If you are subpoenaed you have to show up for Court, do that and if you feel like you have to get on the stand you get on it and lie like a dog if you have to."[85] If the drugs belonged to French, and not Boyd, Boyd would not have had to ask French to lie to protect him.  With regard to the defense's suggestion that French had access to the master bedroom at 736 East Easy Street, both Johnson and Galiano testified that Boyd locked the bedroom whenever he left house and that Boyd typically kept the key.[86]  That the SCPSO officers had to break the door down to gain access to that room during the search[87] also suggests French did not have access to the master bedroom. As French's testimony was strongly corroborated by additional evidence supporting the verdict, the Court finds that the undisclosed evidence was not material for the purposes of impeaching her.

The Court's conclusion that the undisclosed evidence was not material to French's impeachment is supported by defense

---

[85]     (Gov't Ex. 18.)

[86]     (*Id.* at 118-19; R. Doc. 109 at 36-37.)

[87]     (R. Doc. 108 at 23-24.)

counsel's thorough impeachment of French on other grounds.  As
discussed above, the jury heard that French received immunity for
her testimony against Boyd, even though she was found at 736 East
Easy Street, where the SCPSO discovered a large quantity of
crack.[88]  Defense counsel also brought out that French had been
arrested for numerous offenses, including the issuance of
worthless checks, theft over $500, and falsification of public
records.[89]  In addition, French testified regarding her history
of drug use as well as her association with known drug dealers
and addicts.[90]  French had already pleaded guilty to the
misdemeanor charge and was sentenced when she testified at trial,
and there were no outstanding charges against her concerning
which she could benefit herself by slanting her testimony or
testifying falsely.  Any "incremental impeachment value" that
Boyd would have gained from disclosure of French's cooperation
with the DEA does not raise a reasonable probability that, had
the information been disclosed, the outcome of the proceedings
would have been different.  *Pyles v. Johnson*, 136 F.3d 986, 1000
(5th Cir. 1998); *see also United States v. Hamaker*, 455 F.3d

---

[88]    (R. Doc. 109 at 42, 101.)

[89]    (*Id.* at 91-96.)

[90]    (*Id.* at 41-44.)

1316, 1328-29 (11th Cir. 2006) (finding no *Brady* violation and denying defendant's motion for a new trial because the additional impeachment value to be gained from questioning a witness on his status as a government informant in an unrelated case was "weak at best").

At the February 16, 2011 evidentiary hearing, defense counsel also suggested that French was possibly cooperating with the government in the Bourgeois matter as early July 2009 when the recorded conversations between French and Boyd took place. The defense argued that, had it been aware of French's cooperation at the time of those conversations, it could have suggested that French intentionally elicited condemning statements from Boyd for the government. The defense based its argument on Agent Scott's testimony at the hearing that he met and signed up French as a confidential informant at some point in 2009. Scott's testimony at the hearing, however, was inconsistent as to the year in which he met French. Although Scott stated several times that he met French in 2009, he also testified that he first met her about two weeks before her controlled purchase and that the controlled purchase took place in 2010. Scott stated in his affidavit that he first met French in May 2010 and that French offered to cooperate on Bourgeois's behalf *after* Bourgeois was sentenced. Bourgeois was not indicted

until August 13, 2009[91] – after the recorded conversations occurred – and was not sentenced until January 7, 2010.[92]  Based on this information, it appears Scott misspoke when he testified that he first met French in 2009 and that he, in fact, met her in 2010.  The Court thus does not find persuasive the defense's suggestion that French was signed up as a confidential informant at the time of her recorded conversations with Boyd.

Finally, Boyd argues that information regarding French's involvement with the government would have called into question Breedy's assertion that French was given only a misdemeanor summons and released because French was merely a user.[93]  The mechanics of Boyd's argument are opaque.  He appears to contend that the undisclosed evidence could have been used to cast doubt on the trial evidence that French received no personal benefit from her testimony.  Apparently, the theory is that French's cooperation with law enforcement in 2010 somehow suggests that she began to cooperate immediately after she was discovered at 736 East Easy Street and that her misdemeanor charge was, in fact, given as consideration for her testimony and not because

---

[91]    (Crim. A. No. 09-244, R. Doc. 7.)

[92]    (Crim. A. No. 09-244, R. Doc. 43.)

[93]    (R. Doc. 102.)

37

the officers thought that it was appropriate under the circumstances.  The problem with Boyd's theory is that it is a weak argument to infer earlier cooperation from later cooperation.  It does not follow that, because Boyd was cooperating with law enforcement in 2010, she was also cooperating in 2008, especially given Agent Scott's testimony at the evidentiary hearing that French began cooperating in 2010 to assist Bourgeois.  Further, there is no other evidence in the record to suggest that French entered into a deal with the government related to her testimony at Boyd's trial.  It is thus not reasonably probable that the jury would have disbelieved Breedy's account in light of the undisclosed evidence.  Nor does the suggestion that French received a personal benefit in exchange for her testimony call into question the substantial evidence presented at trial in support of the charges against Boyd.

Alternatively, Boyd may be suggesting that the undisclosed evidence could have led to the jury to conclude that French began to cooperate with the government immediately after she was discovered at 736 East Easy Street and that, because of her cooperation, the officers did not investigate her possible connection to the drugs in the master bedroom.  This theory suffers from the same flawed logic as the previous argument.

And, as discussed above, overwhelming evidence – including Boyd's own statements – indicated that the drugs belonged to Boyd.  The Court also notes that, according to Agent Scott, French bought only 2.5 ounces of cocaine during the controlled buy for the DEA, which is consistent with the Breedy's testimony that French was a user, and not a seller.  Even had the defense had the opportunity to question Breedy regarding French's cooperation in the Bourgeois matter, it is not reasonably probable that that line of questioning would have affected the outcome of the proceedings.

For these reasons, the Court finds that the undisclosed evidence was not material for the purposes of impeachment.

b.   *Entrapment*

Boyd also argues that the nondisclosure was material because defense counsel could have presented an entrapment defense had French's involvement with the government been disclosed before trial.[94]  "The critical determination in an entrapment defense is whether criminal intent originated with the defendant or with the government agents."  *United States v. Bradfield*, 113 F.3d 515, 521 (5th Cir. 1997).  The government may use under cover agents to enforce the law, and "artifice and stratagem may be employed

---

[94]    (R. Doc. 102 at 2-6.)

to catch those engaged in criminal enterprises." *Jacobson v.
United States*, 503 U.S. 540, 548 (1997).  Entrapment arises only
when the government, in its "zeal to enforce the law,"
"implant[s] in an innocent person's mind the disposition to
commit a criminal act, and then induce[s] the commission of the
crime so that the Government may prosecute." *Id.*  Thus, before a
defendant is entitled to an entrapment defense, the defendant
bears the burden of presenting evidence of both "(1) his lack of
predisposition to commit the offense and (2) some governmental
involvement and inducement more substantial than simply providing
an opportunity or facilities to commit the offense." *Bradfield*,
113 F.3d at 521.

The Court finds that, even had French's cooperation with the
government been disclosed to him, Boyd could not have plausibly
presented an entrapment defense.  First, Boyd would have been
unable to meet the threshold requirement of showing lack of
predisposition to commit the offense.  Predisposition focuses on
whether the defendant was an "unwary innocent" or, instead, an
"unwary criminal" who readily availed himself of the opportunity
to perpetrate the offense.  *Id*. at 523.  "Specifically, the
question is whether the defendant intended, was predisposed, or
was willing to commit the offense *before being approached by
government agents*." *Id.*  Here, the jury heard testimony from

40

other witnesses that Boyd provided them with crack as early as 2006.[95]  The jury also heard testimony regarding Boyd's 1993 state court conviction for three counts of distribution, possession with the intent to distribute marijuana, and possession with the intent to distribute cocaine.[96]  In light of the evidence of Boyd's history of distribution of crack and his prior conviction, it is not reasonably probable that the jury would have believed Boyd was not predisposed to engage in the criminal activity for which he was charged.  *Cf. United States v. Parish*, 736 F.2d 152, 156 (5th Cir. 1984) (explaining that a prior conviction for a crime very similar to the one for which the defendant is on trial is "highly relevant" to the issue of predisposition).

Nor could Boyd have used the undisclosed evidence to establish inducement.  In order to suggest that he was induced by the government, Boyd would have been required to convince the jury that French was working with law enforcement *before* his November 18, 2008 arrest.  Yet, French's involvement with law enforcement in the other case does not plausibly support that contention.  Breedy testified at the February 16, 2010

---

[95]     (R. Doc. 108 at 114; R. Doc. 109 at 32-34.)

[96]     (R. Doc. 109 at 130-31.)

evidentiary hearing that he was not acquainted with French before
November 18, 2008, when Boyd was arrested, and Agent Scott
testified that he became involved with French in 2010, when she
contacted him offering to work as a confidential informant to
Bourgeois.  To the degree Boyd argues that the officers involved
in the investigation have engaged in a conspiracy to conceal
French's earlier cooperation against him, it is based on pure
speculation, as there is no evidence in the record to support
such an inference.  Because the undisclosed information in this
case relates only to French's involvement with the government
after Boyd's arrest, there is not a reasonable probability that
the undisclosed information would have affected the outcome of
the proceedings; the evidence is therefore not material.


## III. CONCLUSION

As the undisclosed evidence was material neither for
impeachment nor as a basis for an entrapment defense, Boyd has
failed to establish a violation of *Brady*.  Accordingly, the Court
finds that the interest of justice does not require a new trial
under Rule 33.  *See United States v. Valencia*, 600 F.3d 389, 418
(5th Cir. 2010) (explaining that, "as the proponent of a new
trial" based on undisclosed evidence, the defendant was required
to establish the three prongs of *Brady*).

42

Even though the undisclosed evidence was not material, the Court notes that the breakdown in communications between the DEA and the AUSA is disturbing.  Lieutenant Breedy was aware before trial that French was to be a witness in this case and that she was working with Agent Scott in the Bourgeois matter.  Yet, he failed to relate that information to AUSA Jones, even though French personally informed him of her cooperation with the government at a pre-trial meeting at which Jones was present.  Nor is it apparent that AUSA Jones made clear to the agents what they were required to disclose to him, as Breedy claimed not to have known that information of this type could be *Giglio* material.  The prosecution dodged a bullet in this case because, ultimately, the undisclosed information was not material.  But its failure to discover all of the information relevant to Boyd's defense from the law enforcement officers involved in the investigation triggered this motion and required the Court to engage in the delicate process of reexamining all of the evidence under the exacting standard set forth in *Kyles*.  Routine discovery and disclosure of information such as was at issue in this motion avoids such time-consuming post-trial proceedings and promotes confidence in the fairness of verdicts and trials.  This situation was avoidable, and the government should take steps to ensure that this type of information is identified and produced

43

as a matter of course.  *See Kyles*, 514 U.S. at 439-40 (explaining that, materiality aside, the conscientious prosecutor will disclose a favorable piece of evidence, and that "[s]uch disclosure will serve to justify trust in the prosecutor as the representative of a sovereignty whose interest in a criminal prosecution is not that it shall win a case, but that justice shall be done") (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)).

For the foregoing reasons, Boyd's motion for a new trial is DENIED.

New Orleans, Louisiana, this 24th day of February, 2011.

SARAH S. VANCE

UNITED STATES DISTRICT JUDGE